IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACQUELINE DRINKS, | : | **CIVIL ACTION NO.: 02-CV-4352** |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| LOCKHEED MARTIN CORPORATION | : | |
| MANAGEMENT & DATA SYSTEMS, | : | |
| | : | |
| *Defendant*. | : | |

## LEGAL MEMORANDUM IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Lockheed Martin Corporation Management and Data Systems ("Defendant") hereby files its memorandum of law in support of its motion for summary judgment:

## I.    PROCEDURAL BACKGROUND

### A.    Status of Case

On or about June 26, 2002, Jacqueline Drinks ("Plaintiff") filed a civil action complaint in federal court against defendant alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(A)(1) alleging racial discrimination, disparate

treatment based upon race and retaliation. She also seeks compensatory and punitive damages as well as injunctive relief against defendant. In this regard, plaintiff contends defendant failed to promote her, failed to transfer her to "exempt" status, and ultimately terminated her from defendant's employment, as a result of her race (African American).

Discovery is complete. There being no genuine issue of material fact, defendant is entitled to judgment as a matter of law. Pursuant to F.R.C.P. 56(b), defendant, therefore, files its motion for summary judgment and this memorandum in support thereof.

**B.    <u>Standard for review</u>**

FRCP 56(c) provides "the test [for granting summary judgment] is whether there is a genuine issue of material fact, and if not, whether the [movant] is entitled to judgment as a matter of law." <u>Ambruster v. Unisys Corp</u>., 32 F.3d 768, 777 (3d Cir. 1994). A "material fact" is defined as a fact that affects the outcome of the litigation based upon the applicable law. <u>Kelly v. Drexel Univ</u>., 907 F.Supp 864, 870 (E.D. Pa. 1995). Where "a reasonable jury could return a verdict in favor of the non-moving party" based upon certain contested evidence, a genuine issue exists that ultimately must be resolved by the factfinder, and the court should deny summary judgment. *Id*.

However, where the factual record unequivocally demonstrates that no material issue of fact exists and the non-moving party fails to sustain her burden of proof, the trial court should grant summary judgment. When filing a motion for summary judgment, the movant bears, at all times, the primary burden of establishing the lack of a material issue in dispute. In ruling upon a summary judgment motion, therefore, the court must give all benefit of the

doubt to the non-moving party, and "view inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir.1999) *aff'd*, 532 U.S. 514 (2000).

The non-moving party cannot merely cast doubt upon the movant's argument to create a disputed issue in order to defeat summary judgment under Rule 56. *Id.* at 863.  In order to survive a motion for summary judgment, the non-moving party must identify specific facts of record that support the conclusion that a genuine dispute exists, such that the factfinder must resolve the dispute at trial, and "not rely merely upon bare assertions, conclusory allegations, or suspicions." *Id.*, *citing* Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).  The non-movant, therefore, must direct the court's attention to sufficient evidence that creates a justiciable fact, i.e., that would allow the fact-finder to rule in her favor at trial.  Gleason v. Norwest Mortgage, 242 F.3d 130, 138 (3d Cir. 2001).  If the non-movant fails to do so, the court should grant summary judgment.  *Id.*

## II    MATERIAL ISSUES NOT IN DISPUTE

### A.    Factual Foundation

In 1984, defendant hired plaintiff as a secretary in the Engineering Department. (*Drinks dep.*, 9 - Exhibit "A").  Her job duties included typing correspondence, answering phones, making travel reservations, and other general clerical chores. (*Id.*).  Prior to working for defendant, plaintiff was employed as a secretary for the Philadelphia Naval Shipyard, where her job duties were similar to those she initially performed for defendant.  (*Id.*).

In 1990, plaintiff transferred to a new department, the configuration data management department ("CDM") where her job title was "Building Specialist Configuration Manager." Plaintiff's assignment was to support the computer engineers. She worked in the library, filing and microfiching documents. (*Complaint*, ¶12-Exhibit "B").  During this time, plaintiff alleges Ann Fusco was her supervisor, and responsible for training plaintiff. However, defendant did not employ anyone named Fusco at that time. (Exhibit "C", Affidavit of Joanne Dietrich).

Plaintiff claims she complained about Fusco and as a result, around 1990, was transferred to another new program (Program 444) where she retained the same job title and salary, although her new position was "non exempt." (*Drinks dep.*, 38, *Complaint*, ¶ 15). Plaintiff remained in this position until 1995, performing satisfactorily.

In 1995, plaintiff transferred into another CDM program (Program 470). (*Drinks dep.*, 38-39, *Complaint*, ¶ 20).  Although her salary was higher than before, she remained in non-exempt status. (*Complaint*, ¶ 18).

In 1997, plaintiff was placed into the "TBD/TBR" area within CDM, although she also continued to work in the microfiche library (*Drinks dep.*, 81, *Complaint*, ¶ 23, *Sheehan dep*, 13 - Exhibit "D").  TBD/TBR stands for "to be determined/to be reviewed" and refers to documents that track items that the program engineers determined need to be written or revised.  It was plaintiff's job to keep logs in order to track TBD/TBR documents, by entering them into the CDM database, and maintain a "tickler" system to ensure the engineering

review board ("ERB") remained aware of and took later action with respect to these open items. *(Grebe, dep.*, 12-13 - Exhibit "E"). Her supervisors at that time were Mary Grebe and Michael Lewis. (*Complaint*, ¶ 23). The TBD/TBR position was administrative (i.e., on the "administrative" side), as opposed to engineering, (i.e., on the "build" side). (*Drinks dep.*, 79).

From March, 1997 until April 1998, plaintiff worked as a librarian and as a member of the TBR/TBD team. As her supervisor (Mary Grebe) and manager (Maureen Sheehan) testified, her TBR/TBD assignment was not considered, nor funded as a full-time position, and therefore required the person performing it to multi-task, which plaintiff did by performing as a librarian. However, in December, 1997, due to budget cutbacks in the CDM, the library position plaintiff had filled was abolished. (*Sheehan dep.*, 15-16; *Grebe dep.*, 11; 17; 20; 25; 54). Plaintiff was then assigned full time to TBD/TBR, even though this position was not funded as a full-time one. (*Grebe dep.*, 25).

In October, 1998, due to lack of work within CDM, plaintiff was placed on paid "idle time," or "A01 status," until approximately the time of her lay off. (*Sheehan dep.*, 52-53). As the plaintiff testified, A01 time operates as an internal "lay off" for purposes of working on a project, only. Plaintiff continued to receive her pay and benefits during the idle time, and was encouraged to find another position by checking company employment postings and filling out self-nominations, and could take training courses. (*Sheehan dep.*, 53-55).

Although an employee on "idle time" received full pay, these costs were charged to defendant's overhead, as opposed to being billed to a client were the employee attached to

a project. (*Drinks dep.,* 40-41). The obvious implication is that the longer one remains on "idle time" (i.e., unable to find a billable job and work on a project), the more precarious one's position became within the company, because one essentially was drawing pay and not doing any work.

Plaintiff took temporary positions that intermittently took her off of A01 status, but found no permanent position within the company. One of these temporary assignments was work on the Tomahawk missile program for approximately 3 months, under the management of Mike Clampitt, who (along with Mary Grebe and Maureen Sheehan) also provided input into Sheehan's appraisal review. (*Sheehan dep.*, 40-41; Exhibit "F", a copy of Sheehan's request for appraisal input). Michael Lewis allegedly told plaintiff that exempt positions were open in the "build department," however, when plaintiff applied for various "build side" positions, she was rejected (*Drinks dep.,* 79, *Complaint,* ¶ 27).

In August, 1999, plaintiff received an overall "satisfactory" rating, (i.e., "3") in her annual "performance appraisal" from Ms. Sheehan, with several "needs improvement" (i.e., "2") ratings included. (Exhibit "G", a copy of Performance Review for period of 4/98 to 8/99). The review stated that budgetary constraints "identified in the summer of 1998 to the CM team, forced management to downsize the CM admin. Positions by two heads. [Plaintiff] was placed on A01 status in October, 1998 [briefly assigned to Clampitt's management team pertaining to the close out of the Tomahawk program] and returned to A01 status when her assistance was no longer required."

Thereafter, defendant again placed plaintiff on "lack of work status," i.e., A01 status.

(*Drinks dep.*, 22-23). She remained on idle time until she was terminated in March, 2000. (*Drinks dep.*, 42). Eventually, defendant's economic situation required Sheehan to cut a position under her supervision; "I had eight jobs and nine people [including plaintiff, who still was on "idle time"] and I needed to downsize by one person." (*Sheehan dep.,* 61). Towards that end, Sheehan testified that she was permitted by the company policy on Reduction in Force ("RIF") as interpreted by HR to select plaintiff because she was on A01 (without any assignment or work). ( *Id.*, 60-61). However, to be absolutely sure that she was selecting the least qualified employee for lay off, Sheehan prepared a RIF matrix, as set forth in this policy, of all employees within the non-exempt CDM "job family" of which plaintiff was a member, in order to evaluate which employee should be laid off. (*Id.*, 61; Exhibit "H", a copy of RIF Matrix). Because plaintiff ranked the lowest in terms of overall job performance and versatility, plaintiff was the one chosen.

On March 16, 2000, plaintiff was given two weeks notice (i.e., until 3/31/00) of her termination during a meeting with Sheehan and HR. (*Drinks dep.*, 42-44; *Complaint*, ¶ 33; Exhibit "I", a copy of defendant's lay off letter to plaintiff). Plaintiff alleges she was the only employee, and the only African American employee, to be laid off. (*Complaint*, ¶ 34).

B.    **Facts Not in Dispute**

1.    **M&DS Policies.**

M&DS policies are non-discriminatory on their face and require the use of objective and non-discriminatory criteria in their application by managers. (Exhibit "J", a copy of defendant's response to the PHRC).

2.      **M&DS Policies Applied to Plaintiff**.

Plaintiff has admitted that she did not know about specific M&DS policies, even though she could access them on the M&DS intranet. (*Drinks dep*., 16; 21; 50; 93; 97; 116.)

Plaintiff has admitted that she was free to apply for any posted position (*Id*., 81) and testified that she had applied for many positions that were so posted. (*Id*., 42; 74; 81). These policies call for the listing of all open positions, the right for all employees to post (apply) for those positions, the selection of qualified candidates to be called for interviews, the criteria to be used in those interviews and the ratings of those interviewed and the selection of the best qualified candidate. Plaintiff further admitted that in each case where she applied for the open positions, she was treated fairly. (*Id*., 82-83).  Finally, Plaintiff admitted that the only complaint she had with the process for applying for open positions was that she was "unhappy" that she was not chosen but also admitted that she had no idea whether the other candidates were more qualified or not. (*Id*., 74-80; 82; 100).

Plaintiff admitted that she was only complaining about cross-training in this lawsuit. "The training I was talking about that I did not receive appropriate training was cross-training." (*Id*., 15).  While she believed that the authorization was verbal, she had no knowledge of whether a company policy existed on cross-training. (*Id*., 15-16).  This type of training was not a formal, internal course.  Rather it was an informal term applied to those situations where CDM personnel who were already assigned to a program could be trained on-the-job to understand and execute the responsibilities of other CDM personnel during

times of absence. (*Sheehan dep.*, 29-32). Plaintiff admitted that this type of training was under the control the CDM manager and given in the discretion of that manager. *(Drinks dep.*, 16).

Plaintiff admitted that she was not aware of the ("RIF") Policy. (*Id.*, 116)

Sheehan testified that she was permitted by the RIF policy to select plaintiff because she was on A01 (without any assignment or work). ( *Id.*, 60-61). However, to be absolutely sure that she was selecting the least qualified employee for lay off, Sheehan prepared a RIF matrix, as set forth in this policy, of all employees within the non-exempt CDM "job family" of which plaintiff was a member, in order to evaluate which employee should be laid off. (*Id.*, 61; Exhibit "H"). Because plaintiff ranked the lowest, plaintiff was the one chosen. Plaintiff has admitted that she was not aware of this policy. (*Drinks, dep.*, 116). Therefore, none of Sheehan's testimony is contested.

During her deposition, plaintiff admitted that her interfaces with M&DS personnel were professional and that at no time did she see or hear anything that would have led her to believe that these individuals were motivated to discriminate against her. These individuals included her managers, Lewis, Clampitt and Sheehan, and her supervisor, Grebe. (*Id.*, 62-63; 71; 82-83; 87; 114; 116-117). Indeed, plaintiff admitted that the M&DS people treated her "nice" (*Id.*, 87) and that her only proof of discrimination was her own "assumption" or "conjecture." (*Id.*, 67-68; 89-90; 121).

Finally, plaintiff admitted that she never at any time during her employment at M&DS complained, either formally or informally, orally or in writing, that she had been the victim

of discrimination because of race or disparate treatment based on race. (*Id*., 21-22; 24; 47-48; 51; 53; 87; 94-95; 99), even though she also admitted that she knew she could go to HR to register a complaint on discrimination.  "I had the opportunity."  However, she then stated that she did not avail herself of that opportunity.  (*Id*., 21-22).  She did not complain when she applied for other jobs (*Id*., 47-48) or when she was informed of her lay off. (*Id*., 45).

Although she was aware of defendant's anti-discrimination policies, saw them posted during her employment with defendant, knew defendant's clients (including the U.S. federal government) required all outside contractors, such as defendant, to maintain and implement anti-discrimination policies, and was aware of anti-discrimination laws, she did not mention anything about discrimination or disparate treatment.

In short, Plaintiff did not claim that she had been discriminated against until after she had left the company and filed her complaint with the  Pennsylvania Human Rights Commission. (*Id*., 94-95).

### C.    Factual Resolution of Potential Conflicts

The purpose of this part of the factual section of the brief is to determine whether certain factual conflicts arise to the level of a "genuine issue of material fact."  As defendant will show, these conflicts do not arise to that level, as they can not affect the outcome of the litigation.

### 1.    Potential Fusco Discrimination.

While defendant denies anyone of this name worked with plaintiff, defendant believes

that, for purposes of deciding this motion, the Court will assume the truth of this allegation. Nevertheless, this does not amount to a material fact in issue, as the encounter did not in any way negatively impact plaintiff's pay, opportunities for advancement or ability to continue to work at M&DS.

With regard to pay, defendant's records show plaintiff's salary was comparable to other employees within her "job family" with higher-level positions. (Exhibit "K", a copy of the band salary information). With regard to opportunities for advancement through the job posting system, plaintiff has admitted that no interfered with her ability to apply for postings, that the process was fair, that nothing was unfair or discriminatory about the questions asked and that no one was out to get her or would ask her trick questions. (*Id*., 81-83). Finally, with regard to the lay off, it was based on the fact that the plaintiff was on A01 and was ranked last in the RIF matrix. The matrix was based upon four objective criteria, namely past performance, flexibility, critical skills and length of service.

As this potential conflict in expected testimony does not create a material fact in issue, this conflict should be disregarded by the Court. Furthermore, these allegations are time barred, as more fully set forth, below.

### 2.    **Potential Exempt Status Conflict**.

Defendant does not dispute that Plaintiff complained that she wanted to be an "exempt" employee. Defendant believes that, she was properly determined to be a non-exempt employee. Notwithstanding this potential factual conflict, it is not a material fact because it will not affect the outcome of this litigation.

The status of an employee under the Fair Labor Standards Act ("FLSA") is determined by HR policy and is based on whether the work performed is covered by FLSA or not.  It is not uncommon for these determinations to be changed from time to time, as they are a statutory requirement and vary by job description.  Defendant strongly believes that Plaintiff was covered by the Act and was entitled to, among other things, overtime pay per company policies.  Furthermore, for the reasons stated in Subparagraph 1, above, the non-exempt status did not adversely affect Plaintiff's pay, advancement opportunities or continued employment.

Because plaintiff was in no harmed in terms of pay, advancement opportunities and job security because of her classification by defendant as a FLSA-covered employee, this conflict could not affect the outcome of this litigation and thus does not arise to the level of a material fact in issue.

### 3.    **Potential Performance Issue Conflict**.

Defendant does not dispute that plaintiff did not accept the company's performance appraisal as being representative of her capabilities.  This position conflicts with defendant's documented perception of plaintiff's performance.  This factual conflict does not arise to the level of a material fact in issue, as this litigation is not a case of wrongful termination but one of racial discrimination.  Defendant's documented evidence of poor performance lists only objective, non-discriminatory issues.  Plaintiff admits that she disagreed with defendant's appraisal of her but that she saw no evidence of discrimination.  Therefore, the potential factual conflict cannot affect the outcome of this litigation and so does not arise to the level

of a material fact in issue.

Ms. Grebe testified that even though plaintiff was performing less than a full position's worth of work in TBD/TBM, her work was inaccurate, untimely, too slow, and required others (including Grebe) to re-do her data entries. (*Grebe dep.*, 20-21). This detracted from Grebe's other duties. (*Id.*, 27).

Sheehan also noted in the review that plaintiff's work "was not always of the highest quality, or timely." At her deposition, Sheehan explained that in CDM management, two critical performance criteria are necessary: accuracy and timeliness. Plaintiff lacked abilities in either. (*Sheehan dep.*, 35-36).

Sheehan's conclusions are also supported by Mary Grebe's testimony (*Grebe dep.*, 20-21), Grebe's own review of plaintiff's performance (Exhibit "L", a copy of Grebe's input to plaintiff's appraisal) and Grebe's contemporaneous logs of plaintiff's job performance. (Exhibit "M", a copy of Grebe's logs).   Grebe also testified that out of the 10-12 other employees she supervised, plaintiff was the only one who was unable to perform more than one duty which was particularly alarming since plaintiff's TBD/TBR position was not funded as a full-time position. (*Grebe dep.*, 54). Mike Clampitt's assessment was harsher that Sheehan's or Grebe's. He commented that plaintiff's performance was "sub-standard," and gave her a "2" rating overall on the work she performed on the Tomahawk project. (Exhibit "N", a copy of Clampitt's input to plaintiff's appraisal).

In September, 1999, plaintiff wrote a rebuttal to her review contesting her supervisors were unfair in their assessments, but in that rebuttal, failed to complain that unlawful discrimination and/or disparate treatment was the cause. (*Drinks dep.*, 23-24; Exhibit "O", a copy of plaintiff's rebuttal).

Moreover, even though there is a potential conflict between the way others saw Plaintiff's performance and the way that Plaintiff viewed her own performance, that is not germane to the decision of this motion. It is not necessary for defendant to prove that its view was accurate. All that defendant needs to prove was that the views of Grebe, Sheehan and Clampitt were made in good faith, reflect accurately their best opinion of Plaintiff's performance and are supported by substantial, objective evidence. All of the documents, created contemporaneously to the events as they transpired, are filled with specific observations and facts. Even Plaintiff had to admit that there were errors in her work and that precise dates are important (*Id.*, 64).

There is simply no factual basis to believe that anything done by Grebe, Sheehan or Clampitt was pretextual to cover up a desire to discriminate. This finding of fact is admitted and not in controversy. Therefore, this factual conflict is not a material fact in issue because it cannot affect the outcome of this litigation.

### 4.    Potential Cross-Training Issue Conflict.

Plaintiff allegedly attempted to get training in order to succeed in applying for new postings but claims Maureen Sheehan turned down these requests. Ms. Sheehan, however, testified that she authorized all the training plaintiff requested during that time, i.e., two

computer classes that were essentially unrelated to her job requirements, as well as provided plaintiff with "cross training" in order that she could learn the functions of other positions within her "job family," so that she might fill in for a co-worker if they went on vacation. (*Sheehan dep.*, 29-32). This presents a factual conflict. However, for the reasons stated above, the conflict does not represent a material fact in issue because it cannot affect the outcome of this litigation.

During her deposition, plaintiff clarified her complaint to explain that the only training opportunities that were denied to her were the ones involving "cross-training." (*Drinks dep.*, 15). As plaintiff has already admitted that she was not acquainted with M&DS policies, she wasn't qualified to testify on the meaning or interpretation of any policy, whether formal or informal. Her allegation that she needed cross-training in order to apply for postings is in error, as she testified that she was able to apply for all postings in her job category. Second, only after a CDM employee is assigned to a program, would cross-training be considered on that program. We need to take Sheehan's uncontested testimony on this point, as she was the only one qualified to make these determinations. The only exception to this would be if her reasons were pretextual. However, when asked about any animus between Ms. Sheehan and herself, plaintiff admitted that there was none. Therefore, there is no basis to believe that the decisions by Sheehan were pretextual. Without any evidence that the cross-training was denied because of racial discrimination directed at plaintiff, this factual conflict cannot arise to the level of a material fact in issue because it cannot affect the outcome of the litigation.

5.    **Potential Posting Issue Conflict**.

Plaintiff applied for other positions under Sheehan's management. Sheehan testified at her deposition about three of these postings in particular. Internal job postings included the minimum qualifications the applicant needed to perform the job, and candidates were ranked against each other in a comparative analysis. In each instance, plaintiff ranked the lowest of all candidates for each position. (*Sheehan dep.*, 56-57).

All of the evidence supports a detailed evaluation of all applicants, using only objective and non-discriminatory criteria upon which to judge the applicants' capabilities to perform the job functions. Again, plaintiff has admitted that she saw no evidence that Sheehan was not acting in good faith or was trying to discriminate against plaintiff. Therefore, this factual conflict does not arise to the level of a material fact in issue because this conflict cannot affect the outcome of the litigation.

In conclusion, plaintiff cannot raise any material issues of fact that would need to go to a jury for resolution. Facts which the plaintiff alleges are in dispute are not material facts in issue and cannot affect the outcome of this litigation. Therefore, the use of summary judgment in this case is appropriate.

## III    LEGAL ARGUMENT:

### A.    Plaintiff's claims are time-barred

Plaintiff alleges defendant discriminated against her at different instances from 1990 until her termination in 2000. Nevertheless, she failed to complain internally, or even file any

claim(s) with the PHRC or EEOC until July, 2000. A "continuing violation" theory cannot toll the applicable statute of limitations under Title VII for filing discrimination claims with the administrative agency for discrete discriminatory acts, such as failure to promote and transfer. Her claims are, therefore, time-barred. National Railroad Passenger Corp. (Amtrak) v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed. 2d 106 (2002), see also Ryan v. General Machine, 2003 WL 21982194 (E.D. Pa. 2003), Miller v. New Hampshire Dep't of Corrections, 296 F.3d 18 (1st Cir. 2002)[failure to transfer or promote [is a] discrete act, and therefore not actionable if it falls outside the statutory period]. Under Morgan, the "continuing violation" theory applies only to serial hostile environment claims, or possibly systemic violations, neither of which plaintiff has alleged in this case.

Plaintiff's claims are, therefore time barred, and all of her claims of discrimination hinging upon defendant's failure to promote or transfer her should be dismissed, unless plaintiff can show that they fall within the applicable statutory period.

## B.    Plaintiff fails to overcome her burden of establishing "pretext"

Assuming plaintiff has met her initial burden of establishing a *prima facie* case of discrimination (i.e., member of protected class, adverse employment action, otherwise qualified for position, non-protected class members similarly situated to plaintiff treated favorably in comparison to plaintiff), the burden shifts to defendant to establish an alternative explanation for its adverse employment actions against plaintiff. St. Mary's Honor Ctr. v. Hicks, 113 S.Ct. 2742 (1993), McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817

(1973).

Here, plaintiff's evidence is entirely speculative in nature and consists of her "assumption" or "conjecture" that she was discriminated against. (*Drinks dep.* 67-68; 89-90; 121) This is a far cry from meeting her legal obligation of proof. "[I]n the absence of direct evidence of discrimination, a plaintiff may rely on circumstantial evidence to demonstrate weaknesses, inconsistencies, implausibilities, or contradictions in the employer's explanation for its action 'so as to permit a reasonable factfinder to infer that the employer did not act for the proferred reasons.'" Shaner v. Synthes, 204 F.3d 494, 503 (3d Cir.2000) (citing Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir.1994). Plaintiff, therefore, must show that the defendant's explanation of events is pretextual, i.e., that either defendant's proffered reasons are not true, or that the explanation is not worthy of belief. Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3d Cir. 1995). Plaintiff cannot meet this burden.

As outlined in the previous Sections II.B and II.C of this brief, defendant has shown that its policies were non-discriminatory on their face and were applied to Plaintiff in a non-discriminatory manner; that management exercised its managerial judgment and discretion in a professional manner toward Plaintiff, who saw no signs of discrimination in their attitude toward her; that Plaintiff had every opportunity to make claims of discriminatory conduct against M&DS for many years and did not do so; that her pay was fair and reasonable against her peers and betters; that her opportunity for advancement was unobstructed; that her lay off was double checked by means of a RIF matrix to ensure that she was treated fairly; that her right to receive overtime pay was strictly observed; that her performance shortcomings were

clearly articulated to her to give her many chances to improve; and that college tuition was granted to her and internal training was provided.

She has failed to demonstrate that any of her supervisors or H.R. worked against her in areas of pay, potential advancement or job security. She has admitted that they treated her professionally and were nice and that she did not see that discrimination played any role. Indeed, plaintiff herself admitted she has no proof that her race factored into her lay-off (*Drinks dep.*, 90) and that her lack of a college degree, bad economic conditions and skill level may have factored in the decision to terminate her. (*Id.,* 109). When she ultimately found another job after she was terminated, she was hired as a "clerk/typist,"--the same position she initially held in 1984. (*Id.*, 100-111).

Plaintiff is unable to "produce sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." Sheridan v. E.I. duPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996). While establishing pretext is a heavy burden to sustain, s*ee* Pamintuan v. Nanticoke Memorial Hospital, 192 F.3d 378 (3d Cir. 1999), plaintiff seems to have admitted away any chance to prove it. Keller v. Orix Credit Alliance, 130 F.3d 1101 (3d Cir. 1997), *citing* Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994). First, plaintiff can not offer evidence that defendant's reasons are weak, implausible, inconsistent and contradictory. Nor can plaintiff  identify evidence that implies discrimination was more likely than not the motivating cause of the adverse employment action. For these reasons, plaintiff cannot meet the burden laid out in Keller .

Defendant is, therefore, entitled to summary judgment as a matter of law on plaintiff's claims of job related discrimination.

**C.    Plaintiff fails to prove defendant retaliated against her**

Plaintiff admittedly did nothing to complain internally about discrimination at any point during her employment, even failing to complain during her termination meeting with supervisors and H.R. on March 16, 2000. Plaintiff testified she was aware of defendant's problem solving procedures and of her right to file a complaint but that she did nothing.

In fact, plaintiff did nothing about defendant's alleged discrimination until *after* she left the company. The obvious inferences one reaches are not only that the defendant did not discriminate against plaintiff, but also that plaintiff does not believe defendant discriminated against plaintiff, either.

The failure to complain to her employer during her tenure of employment that any action regarding the terms and/or conditions of her employment was discriminatorily motivated is fatal to her retaliation claim. To prevail on a retaliation claim, plaintiff must prove that she engaged in protected activity; that defendant took adverse employment action against her; and that there exists a causal link between the protected activity and the employment action. Robinson v. City of Pittsburgh, 130 F.3d 1285 (3d Cir. 1997). Even though defendant ultimately may have taken an adverse action against her by terminating her, plaintiff cannot show she engaged in any "protected activity" prior to then, because she did not file her complaint nor made any charge of discrimination until *after* she left the company.

*See* 42 U.S.C. § 2000e-3(a) [Title VII].

Therefore, defendant could not have retaliated against plaintiff if plaintiff did not claim defendant's actions were discriminatory or complain prior to her termination or during her employment with the defendant. Plaintiff admits she never made any specific complaints of discrimination, and therefore, did not participate in any "protected activity" under Title VII. Defendant did not retaliate against her in any fashion, and defendant is, therefore, entitled to summary judgment as a matter of law on plaintiff's claims of retaliation.

## VI    CONCLUSION

Based on the foregoing undisputed material facts, as well as the legal arguments advanced by the Defendant herein, the entry of Summary Judgment pursuant to F.R.C.P. 56(c) is appropriate.

Respectfully submitted,

SIDNEY L. GOLD & ASSOCIATES, P.C.

_____

SIDNEY L. GOLD, ESQUIRE
Identification No.: 21374
Eleven Penn Center - Suite 515
1835 Market Street
Philadelphia, PA 19103
(215) 569-1999
**Attorneys for Defendant**