**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JACQUELINE DRINKS, | : CIVIL ACTION NO.: 02-CV-4352 |
| *Plaintiff*, | : |
| v. | : |
| LOCKHEED MARTIN CORPORATION MANAGEMENT & DATA SYSTEMS, | : |
| *Defendant*. | : |

**MEMORANDUM OF LAW
IN REPLY TO PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Defendant filed its Motion for Summary Judgment and its Legal Memorandum in support thereof, outlining its claim to a right to Summary Judgment on the basis that plaintiff's claims are time barred, that plaintiff had failed to carry her burden of establishing pretext and the plaintiff had failed to prove retaliation.

Plaintiff has filed a Memorandum of Law in Opposition to defendant's Motion, contesting all three bases raised by defendant.

After careful review of plaintiff's opposition and the record, defendant sees nothing that would change its right to a Summary Judgment and reiterates its request to the Court to issue a Judgment in its favor.

## II.   JURISDICTION BASED ON TIMELINESS

In a dual filing, as here, plaintiff correctly points out that the EEOC permits a 300 day window from the date of the alleged violation to file a charge with it. Granted this time window, plaintiff has failed to show that any act taken by defendant, other than the lay off itself, lies within the statute's time limitations. Plaintiff brings four postings to the Court's attention, all of which plaintiff argues fall within the applicable statute of limitations.

Defendant disagrees. Looking at the posting most prominently cited by plaintiff, we see that plaintiff applied for a posted position and was notified on May 10, 1999 by Maureen Sheehan, the hiring manager, that she was not selected for the assignment. (Pl. Opp., Exh. "H") The document shows the objective criteria used to determine the relative qualifications of the five applicants. Plaintiff, rated at 140 points, fell in the middle. The lowest ranked applicant received a score of 110; another applicant received 140, the same as plaintiff. The winning applicant scored 180 points, while the runner up received 170.

However, inasmuch as the notice was given to plaintiff on May 10, 1999 and as plaintiff filed her charge with the EEOC on July 17, 2000, it is clear that plaintiff is time-barred with regard to this posting. As to the other three postings (Pl. Opp., Exh.'s "I", "J" and "K"), the dates of these applications are 8/17/99, 6/17/99 and 6/11/99, respectively. While plaintiff admits that she was "subsequently rejected" for these positions, plaintiff fails to establish any dates within the time limitation of 300 days. Given the dates of application and the speed with which openings were filled, it is highly unlikely that

plaintiff can carry her burden of proof as to timeliness.

Furthermore, plaintiff makes no argument that any of these positions were denied to her on the basis of pretext. It is clear that plaintiff has abandoned her claims of pretext with regard to these positions.

Therefore, the Court should grant defendant's Motion with regard to these claims.

### III. PRETEXT

#### A. Overview

Plaintiff has abandoned all claims of pretext, other than the "challenged employment action" of the lay off, as set forth on pages 12-13 of its memorandum of law. With regard to the lay off, plaintiff puts forward three separate assertions as bases from which pretext can be inferred:

> *"Despite defendant's claims to the contrary, plaintiff has provided evidence that defendant's reasons for the challenged employment action are at a minimum, inconsistent and contradictory, relegating to pretext, defendant's proffered reasons for terminating plaintiff."*

Plaintiff's first allegation of proof of pretext is that the testimony of Grebe and Sheehan are inconsistent with the final two appraisals and may (defendant presumes) have tainted the lay off decision.

Plaintiff's second allegation of proof of pretext is that Sheehan chose the wrong group of employees to be compared in the reduction in force matrix in violation of company policy, thus, presumably, tainting the lay off decision.

Plaintiff's third allegation of proof of pretext is that Sheehan pre-judged the lay off decision, thus tainting the objectivity of the RIF matrix.

For the reasons set forth, below, defendant believes that plaintiff's assertions are wrong factually, logically and legally.

### B. Testimony of Grebe and Sheehan

#### 1. Summary of Plaintiff's Allegations

Plaintiff premises her position on the proposition that "…Plaintiff's Appraisal Reports…should have informed, in large part, the decision as to whether to lay off plaintiff under defendant's Reduction in Force initiative." (Pl, Opp., 11)  Plaintiff then alleges that the testimony of Grebe and Sheehan show some disagreement with the accuracy of two of plaintiff's appraisals, the 3/97-6/98 appraisal and the 4/98-4/99 appraisal.  Plaintiff finally concludes that "The incongruity between plaintiff's written appraisal reports and her actual performance as testified to by both Mary Grebe and Maureen Sheehan, presents sufficient evidence to 'meaningfully throw into question, i.e., to cast sufficient doubt upon,' the employer's reasons for laying off plaintiff." (*Id*.)

Specifically, plaintiff then cites, as "incongruities," Grebe's testimony on the 4/98-4/99 appraisal (See Exhibit "A" - Grebe Dep., 42-43); Grebe's Note to Sheehan from Grebe's input to the 4/98-4/99 appraisal; Grebe's testimony on the 3/97-6/98 appraisal (*Id*., 67); Sheehan's testimony on the 3/97-6/98 appraisal (See Exhibit "B" - Sheehan Dep., 42); and Sheehan's testimony on the 4/98-4/99 appraisal.

## 2. **Summary of Defendant's Reply**

First, plaintiff's argument is based on a faulty premise. Defendant's policy, MPE-0527, cited as Exhibit "E" to plaintiff's opposition, has four rating categories, of which historical performance is one. The cited policy's instructions on how to compare employees in the area of historical performance does not limit itself just to the written performance appraisals, as plaintiff would have us believe. Even plaintiff had to admit that the actual language of the instruction permits the use of "other related documentation" in addition to the appraisals when making a comparison.

Second, Sheehan's testimony clearly states that, for all nine employees, she relied upon the last couple of appraisals for jobs that were comparable, did an overall assessment and ranked them from 1 through 9 (9 being the lowest). (Sheehan Dep., 69)

Third, plaintiff's characterization of the testimony of Grebe and Sheehan is factually inaccurate. It is important to note that Grebe's testimony on this point is irrelevant, as she did not participate in the decision to lay off plaintiff.

Fourth, plaintiff has failed to address the performance of the other eight employees being compared to plaintiff in the matrix.

Fifth, plaintiff has failed to show any evidence that Sheehan actually did something other than what she testified she did.

The real question before the Court is whether Sheehan used good faith efforts to decide who to lay off in March of 2000 or whether Sheehan's decision was tainted by pretext. Of course, the answer to this question rests on the credibility and integrity of the

person performing the comparison, namely Maureen Sheehan. We need to take a moment to review her actions with regard to plaintiff.

Sheehan sought the input from three individuals before writing her appraisal of plaintiff's performance for the 4/98-4/99 time period. Sheehan sought the input of a fellow worker (Standeben), input from plaintiff's supervisor (Grebe) and input from a manager on a program that plaintiff had been assigned to temporarily (Clampitt). (Sheehan Dep., 47-49)

We know that Clampitt's written input was very negative (Exh. "C") but was largely ignored by Sheehan. (Sheehan Dep., 49) We know that Sheehan felt she was justified to give plaintiff 1's (lowest rating) instead of 2's on plaintiff's appraisal but didn't do so because she felt it would be too harsh. (*Id*., 44-46) We know that Sheehan gave plaintiff an overall 3 rating (satisfactory) when Clampitt's and Grebe's inputs would have indicated a lower rating was appropriate. We know that Sheehan counseled plaintiff on ways to improve but that plaintiff refused to take Sheehan's advice because plaintiff disagreed with Sheehan's assessment. (*Id*., 43)

We know that Sheehan kept plaintiff on A01 (no assignment) for over a year, when she could have terminated plaintiff's employment at any time according to HR due to lack of work. (*Id*., 52; 58; 60-61; 68) We know that HR didn't require a matrix to be used in plaintiff's case but that Sheehan took the time to perform a matrix anyway, because she thought that it would be the fair thing to do. (*Id*., 60-61; 68; See Exhibit "D" - Plummer Dep., 33) We know that Sheehan could have used just the last appraisal in her

assessment of historical performance, per the 12-24 month window established in the company policy, but that she used the earlier appraisals as well, thus benefiting plaintiff. (*Id.*, 69)

The only conclusion that any reasonable and objective person could draw from these facts is that Sheehan exercised sound judgment, tried to be fair and was not motivated by race to discriminate against plaintiff.

### 3. Details of Defendant's Reply

#### a. MPE-0527

Historical performance is defined on page 4 (Instructions for Completing Reduction-in-Force Identification Matrix) as: "Comparison based on past performance of the individuals being considered, principally within the last twelve to twenty-four months. The individual who has been consistently the best performer should ranked the highest. The results of the ranking should be consistent with available documentation on past performance; that is, written performance appraisals <u>and other related documentation</u>." (Emphasis added)

This policy would have permitted Sheehan to use Clampitt's and Grebe's appraisal inputs and no adverse inference could have been drawn, had Sheehan done so.

The whole foundation of plaintiff's argument fails at the outset.

      b.  **Basis of RIF Matrix Rankings (Historical Performance)**

As set forth in Section B.2 of defendant's Legal Memorandum in Support of its Motion for Summary Judgment, there is ample evidence that the decision to lay off plaintiff was based on objective, documented evidence. Generally, that Section also outlines evidence that no racial discrimination took place, including plaintiff's admissions as to this fact.

In addition, we have Sheehan's testimony on the specific issue of comparison of the nine employees. Rather than just use the final appraisal for the period 4/98-4/99, Sheehan testified that when she compared the nine employees in the area of historical performance, she "…looked at their past Performance Appraisals, not necessarily the most recent one, but over a couple of maybe in the past two, three—it depended, I guess, on what the job people were performing. I didn't pick appraisals for a job that wasn't comparative and did an overall assessment of what their overall performance was and ranked them 1 through 9." (Sheehan Dep., 69)

      c.  **Plaintiff's Misstatement of Testimony of Grebe and Sheehan**

With regard to plaintiff's errors in trying to set forth Grebe's testimony, defendant has attached an Addendum hereto as evidence of plaintiff's misstatements. Because Grebe did not participate in the lay off decision, defendant has not included this material in the main body of this Reply Memorandum.

With regard to Sheehan, plaintiff refers to testimony addressing the 3/97-6/98 appraisal done by Mike Lewis and her own appraisal covering the period of 4/98-4/99.

With regard to the 3/97-6/98 appraisal, plaintiff alleges that Sheehan testified that "Mike Lewis' appraisal is not 'particularly accurate…' "(Sheehan Dep., 42)

Actually, when asked about the accuracy of the Lewis appraisal, Sheehan answered: "Well, I do not believe that Mike Lewis is <u>as</u> particularly accurate and that would be March '97 to June '98 appraisal period, but that was not written by me nor is that my stated opinion. That is his opinion of Jacqueline's work. <u>So I don't want to comment on that.</u> I can address the two that you gave me with Mike Clampitt and Mary that I used to write mine." (*Id*.)(**Emphasis added**)

No inferences can be drawn out of this testimony to support plaintiff's position; certainly this is not proof of bad faith or pretext.

With regard to the 4/98-4/99 appraisal written by Sheehan, plaintiff alleges that Sheehan testified that her own appraisal of plaintiff's performance contained "nothing'which would indicate any deficiencies in [her] work', and was the very document to which she [plaintiff] would have referred in order to ascertain the level of her performance at Defendant…." (Sheehan Dep., 49)

Looking at the cited page of Sheehan's testimony, it is plain that Sheehan admitted that plaintiff could go to the appraisal to determine how she was doing but made no mention of what the appraisal said or did not say. Contrary to this rather blatant attempt to misstate Sheehan's testimony, Sheehan actually stated that plaintiff would not sign the

appraisal because of her disagreement over the "development needs" section that Sheehan had written in the appraisal (*Id.*, 43), that certain parts of the appraisal indicated unsatisfactory performance by plaintiff (*Id.*, 44), that certain parts of the appraisal indicated incompetence in some areas (*Id.*, 45) and that Sheehan could have given plaintiff some 1's (unsatisfactory) in some areas. (*Id.*, 46) Contrary to plaintiff's assertions, there were clear indications in the body of the appraisal that plaintiff had deficiencies in her work. (See Exhibit "E" - corrected Exhibit G, Defendant's Main Memorandum)

Again, nothing in Sheehan's actual testimony gives rise to an inference of bad faith or pretext.

### d.    Summary

Plaintiff has misstated the policy guidelines to be used to assess historical performance, has misled the Court as to what Sheehan actually did in making such an assessment and has misstated factually the testimony of Grebe and Sheehan.  Plaintiff has made no logical connection between her allegations and even an inference of bad faith or pretext, and legally plaintiff has failed to show any good reason why this Court should not grant defendant's Motion.

### C. Choice of Work Group for RIF Matrix

Plaintiff alleges that, because some of the employees being grouped in the RIF matrix "had different tasks and task assignments as compared to plaintiff," this Court should jump to the conclusion that the RIF policy was violated and that the violation was motivated by Sheehan's bad faith and pretext. Other than plaintiff's bold assertions, there is nothing in the record to support plaintiff's position.

As was shown in Section B.2 of defendant's Legal Memorandum in Support of Defendant's Motion for Summary Judgment, Sheehan's testimony on the RIF policy is uncontroverted by plaintiff. Plaintiff has admitted that she was not aware of the RIF policy (See Exhibit "F" - Drinks Dep., 116), and plaintiff has not produced an expert on this subject. Sheehan had testified that she used the job family (FUCDN) to determine that she had nine people and only 8 positions and then used the same job family to set up the RIF matrix. (Sheehan Dep., 58-61; 64-67)

The policy itself (Para. B.2 of Implementation) requires that the manager "determine logical sets of employees in each set of functions, skills or positions to be compared for selection for layoff." The instructions for completing the RIF matrix added the following: "Define Group/Community of Interest, a logical set of employees performing similar functions with similar compensation, to be compared on the matrix."

Sheehan chose the job family as the logical set of employees because the core duties of configuration management, the area in which plaintiff worked, were comparable across the nine people in that job family. (Sheehan Dep., 64-65) She chose only the

people who assigned to her. (*Id.*, 66) In order to take into account different tasks, Sheehan testified "Well, I actually try and factor out the tasks that they're assigned, if that makes sense. You only want to focus on the thing that you can compare, not the things that you can't compare. (*Id.*, 65)

Sheehan's general understanding of the RIF policy was confirmed by the testimony of an HR representative, experienced in the application of this policy. (Plummer Dep., 30; 32-38)

All of the evidence in the record points in the same direction, namely that Sheehan exercised her discretion wisely and chose the right group to compare in the matrix. Plaintiff has failed to provide any evidence to the contrary or evidence that Sheehan's choice was caused by pretext.

## IV    PRE-JUDGMENT OF LAYOFF

Plaintiff alleges that because HR told Sheehan that she could reduce her staff by one by laying off the only employee in the FUCDN0 level because of continued lack of work (A01) that this knowledge somehow caused Sheehan to pre-judge the RIF matrix and choose plaintiff before the rankings were made and the numbers were counted.

This argument is patently absurd.

The RIF policy was controlled by HR, which wrote and interpreted the policy. (See pages 1 and 3 of MPE-0527.) HR was responsible for "ensuring approvals of rankings and analysis…" (p.2) Leslie A. Bethea was the Director, Human Resources, at the time for the business area that included configuration management. A black male, Bethea

reported directly to the Vice President, Human Resources.

Sheehan's testimony on this point is as follows:

> "A: Because she [plaintiff] was the only one in that level [0], I technically was not required to do this matrix according to my HR representative, Human Relations representative.
>
> "Q: Who would that have been?
>
> "A: Less Bathea(ph)." (Sheehan Dep., 60-61)

Roy Plummer, an experienced HR representative, testified that managers do not try to apply MPE-0527 in a vacuum but work with HR and legal to get advice and guidance. (Plummer Dep., 30; 35) Plummer also confirmed how people on A01 for extended periods of time are targets for lay off. (*Id*., 33)

Plaintiff was the only level "0" employee, and she had been on A01 (no assignment) for over a year. Plaintiff admitted that her primary responsibility while on A01 was to find another assignment. (Drinks Dep., 41)

After keeping plaintiff on A01 for over a year, Sheehan finally had to take action to downsize. Instead of taking an easy path set forth by HR, which would have meant selecting plaintiff for a lay off, Sheehan took the time and effort to see if plaintiff should be retained and another member of the FUCDN job family be laid off. Defendant cannot see any logic in plaintiff's assertion that Sheehan's action, which could only help plaintiff, would be grounds to claim pretext.

V.    **RETALIATION**

Plaintiff asserts that she filed a claim of discrimination with Roy Plummer in 1997 and was laid off in 2000 in retaliation for having filed the claim.

Plaintiff has misstated Plummer's testimony. Plummer recalled plaintiff's visit to him in early 1997. She came to him out of "frustration." "…[S]he did make reference to it was out of frustration. I don't know, might it be discrimination. And I see behavior like this on occasion with people who have posted for jobs without success. *** And that's when I made it very clear to her. Look, if you feel you've been discriminated against, I need specifics. I need something to work with. You need to tell me what it is exactly that happened that you feel discrimination exists, and I will be obligated and have the responsibility to investigate it to the fullest.

"There was nothing there. The discussion at that point really directed to—well, basically what she needed was assurance that she was gonna have continued work." (Plummer Dep., 7-8)

Again, Plummer reiterated that all plaintiff related to him was a "feeling" of "perhaps" being discriminated against. However, she provided no details. (*Id.*, 12)

Plummer's contemporaneous notes indicate the same tenor as his testimony. Near the beginning, the notes state: "Frustrated by lack of results & not knowing why she has not been selected. Wants to know if there are issues she needs to be aware of in order to address/correct." Later, on the second page, the notes indicate: "Feeling of perhaps being discriminated against, but has no evidence, episodes, situations in support of such

treatment. (Counseling her that if she had any specifics she needed to disclose them to HR for investigation/addressing/correcting.)" (Pl. Opp., Exh. "G")

Inasmuch as no claim was made, there was nothing to investigate. Plummer did not start any investigation because plaintiff would not give any details, other than her feeling that perhaps there was discrimination. There is no evidence that Plummer or plaintiff went to her manager at the time, Mike Lewis. Plaintiff has previously admitted that she never made a claim of discrimination against defendant while she was an employee.

Finally, there is no evidence that Sheehan knew of this meeting with Plummer. As it was Sheehan who made the lay off decision and not Plummer or Lewis, plaintiff has to show that the lay off was motivated by retaliation and not the business downsizing, as testified to by Sheehan.

For all the reasons, enunciated above, it is clear that Sheehan had no knowledge of a claim of discrimination and made her decision solely for business reasons by the use of objective criteria. Again, plaintiff has failed to carry her burden of proof here.

## VI.  CONCLUSION

Plaintiff's Opposition raises no issues of material fact that should go before a jury, presents no evidence that might, even faintly, suggest pretext and misstates the factual

record.  For these reasons, the Court is again requested to enter Summary Judgment on behalf of Defendant pursuant to F.R.C.P. 56(c).

        Respectfully submitted,

        SIDNEY L. GOLD & ASSOCIATES, P.C.

        _____
        SIDNEY L. GOLD, ESQUIRE
        Identification No.: 21374
        1835 Market Street - Suite 515
        Philadelphia, PA 19103
        (215) 569-1999
        **Attorney for Defendant**